423 So.2d 31 (1982)
Thomas P. NAQUIN
v.
TEXACO, INC.
No. 82 CA 0133.
Court of Appeal of Louisiana, First Circuit.
November 16, 1982.
*32 James C. Walker, Jr., Houma, for plaintiff and appellee.
Robert Henry Sarpy, Jr., New Orleans, for defendant and appellant.
Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
This workmen's compensation case is before us on appeal from a judgment finding appellee totally and permanently disabled and awarding penalties and attorney's fees for arbitrary and capricious withholding of compensation benefits.
Appellee Naquin instituted suit against Texaco seeking benefits for total and permanent disability, medical expenses, statutory penalties and attorney's fees. After trial on the merits and pursuant to written reasons, the trial judge rendered judgment in favor of plaintiff-appellee Naquin. From this judgment, appellant has perfected this appeal.
The basic issues presented on this appeal are:
(1) Whether appellee suffered an "accident" within the meaning of workmen's compensation law, and if so, was he disabled as a result of the accident?
(2) Whether a credit should be allowed for compensation and expenses paid under the appellant's Accident and Sick Benefits Plan?
(3) Whether penalties and attorney fees should be assessed?
Naquin, a 58 year old man with a ninth grade education, had been employed by Texaco since 1954. He began as a "camp man" and at the time of the alleged accident on June 7, 1979 had progressed to "second cook." On this date, Naquin contends he injured his neck and back while attempting to remove his suitcase from the aluminum bin at the rear of the crew boat which had transported other employees *33 from the Lake Barre camp to Cocodrie. Appellee testified at trial that upon bending down to remove his suitcase, he "ripped" his back causing a burning pain in the upper and lower regions of his spine. He also experienced severe pain in his chest. At the time, Naquin believed he was having a heart attack. This pain caused Naquin to drop his suitcase and stagger backwards. Two other Texaco employees on the crew boat questioned Naquin as to his well being and retrieved his suitcase.
Appellee's wife was waiting at the dock and after being informed of the incident, she requested that he go to the hospital. At this time, appellee declined the hospital visit. He experienced considerable pain that night and the following morning consulted Dr. William Marmande. Naquin related to Marmande the pain in his neck and back, and particularly chest pain. However, no record was made of the history of the pain. Dr. Marmande performed a cardiogram, which was negative. He diagnosed appellee's condition as muscle pain and prescribed a muscle relaxant. Dr. Marmande saw appellee again on June 13, 1979, at which time he found no change in appellee's condition, but the symptoms were better.
On June 14, 1979, appellee went on his next hitch to avoid a "lost time" accident. On this hitch, Naquin did not perform his usual duties as "second cook", but did the bookwork duties of the head cook whom he was replacing. Naquin told Tillery, the Camp Barre first aid man, of injuring his back when attempting to remove his suitcase from the crew boat bin after completing the June 1, 1979 hitch. Tillery testified that appellee appeared to be in pain and was stooped over. Tillery advised appellee to "go in", but he refused stating that there was no one to take over his duties as head cook.
Upon completing this hitch on June 22, 1979, Tillery advised Sterling Chaisson, appellee's immediate supervisor, that appellee was suffering from a back injury that he claimed occurred when he was in the process of removing his suitcase from the crew boat bin.
Between July and November of 1979, Naquin consulted Dr. Anna Plauche several times concerning dizziness that he had been experiencing since before the June accident, and the pain and numbness he had since the June accident. Dr. Plauche testified that she found a "trigger area" at the base of Naquin's skull which was consistent with his complaints of numbness in his right hand. Dr. Plauche also testified that her treatment was limited to the vertigo complaints, as she was under the impression that Dr. Marmande was treating Naquin for the back injury.
Dr. Plauche referred appellee to Dr. Anthony J. Herques, an ear, nose and throat specialist. Dr. Herques diagnosed Naquin's dizziness as vertigo due to vascular problems. Dr. Herques testified that during the months between September 1979 and January 1980, he saw appellee six times. During a December visit, x-rays were taken which revealed mild cervical arthritis. He testified he did not believe that Naquin's vertigo by itself was of a severe enough nature to prevent him from returning to work, but that he was not familiar with the remainder of appellee's medical history which must be taken into consideration before making a definitive statement of Naquin's ability to return to work.
On March 18, 1980, Naquin saw Dr. Richard Landry, an orthopedic surgeon, on the referral of Dr. Plauche. Dr. Landry took x-rays which showed a narrowing of the cervical 5-6 disc indicating a herniated cervical disc which was pressing on a nerve going into the arm and causing the numbness. Examination verified Naquin's complaints of back pain by muscle spasms and limitation of motion in both neck and lumbar regions. On a subsequent visit, Dr. Landry prescribed a cervical collar and physical therapy. Appellee made several visits to Dr. Landry's office between March and May of 1980, each time indicating that the cervical collar was helping his neck, but that he was still experiencing stiffness and pain when he rotated his neck.
*34 Dr. Daniel Trahan performed an electromyographic study of his neck, shoulder and arm on May 2, 1980, at the request of Dr. Guidry (an associate of Dr. Landry). The findings of this study corresponded to the narrowing of the cervical 5-6 disc and the neck pain complaints.
Dr. John D. Jackson, a neurosurgeon, first saw appellee on May 12, 1980, at which time his diagnosis was a bulging cervical 5-6 disc. This diagnosis was made after studying the March x-rays, the electromyographic report, and the subjective complaints of pain.
On May 21, 1980, Naquin was admitted into Lakeside Hospital for a total myelogram which revealed a large defect at the cervical 5-6 level. On May 22, 1980, Dr. Jackson performed surgery to correct the ruptured disc by performing an anterior cervical fusion at the 5-6 level.
Between May 1980 and April 1981, appellee was seen by Jackson numerous times. Dr. Jackson felt appellee was progressing nicely, and as of April 2, 1981, he felt as though appellee could return to work as far as the anterior cervical fusion was concerned. However, Dr. Jackson clarified that his opinion as to appellee's ability to return to work was limited to the disc surgery's progress and its affected area, the neck and shoulders. Dr. Jackson stated that this opinion did not concern appellee's continuous complaint of low back pain, for which he was not concerned because he thought Dr. Guidry was treating this problem. Appellant contends that Naquin did not sustain his burden of proving an "accident" within the meaning of workmen's compensation. Further, appellant contends that there were no objective symptoms of injury at the time of the alleged "accident".
An "accident" is defined in LSA-R.S. 23:1021 as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of injury."
The employee in a workmen's compensation proceeding has the burden of establishing the disability and its causal relation with the employment accident by a preponderance of the evidence. Prim v. City of Shreveport, 297 So.2d 421 (La.1974). Proof by a preponderance of evidence is sufficient when "the evidence taken as a whole, shows that the fact ... sought to be proved is more probable than not." Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (La.1982), quoting Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (La.1971).
To constitute an accident it is not necessary that the injury be the result of a violent trauma. An accident may be said to have occurred if a part of the body gives way suddenly while the employee is discharging his usual and customary duties.
In the instant case, the testimony reveals that appellee's back "ripped" causing a burning pain in the upper and lower regions of his spine. This "ripping" occurred as he was removing his suitcase from the bin of the crew boat after it had docked.
It is undisputed that appellant provided the transportation via the crew boat to and from the Lake Barre camp, and thus, appellee falls within the exception to the general rule that employees going to and returning from work are not covered by the Workmen's Compensation Act. The exception is an accident that happens while an employee is being transported to or from work by his employer is compensable under the Act if the transportation is furnished as an incident of the employment. W. Malone and H. Johnson, III., Worker's Compensation § 170 in 13 Louisiana Civil Law Treatise (1980).
The objective symptoms are found in the testimony of the two employees on the crew boat at the time of the accident, Dupre and LeBoeuf. Both observed Naquin staggering backwards and inquired as to his well being. Appellee's wife related that he was in much pain the night after the incident, and that it was necessary for him to consult a doctor the following morning.
*35 We find that the trial court was correct and supported by reasonably drawn conclusions from the evidence in finding that there was an "accident" within the meaning of the workmen's compensation statute which arose out of and in the course of appellee's employment.
Appellant contends that appellee is neither entitled to compensation under LSA-R.S. 23:1221(1)(2)[1] for permanent and total disability, nor under LSA-R.S. 23:1221(3)[2] for permanent partial disability.
In Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980), the Supreme Court stated the following concerning permanent and total disability under the 1975 amendment to LSA-R.S. 23:1221(2):
"In determining whether an employee is permanently and totally disabled, it is not a prerequisite that he be absolutely helpless. If the evidence of his physical impairment and of other such factors as his mental capacity, education, and training indicates that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, the injured employee is entitled to total disability compensation unless the employer or his insurer is able to show that some form of suitable work is regularly and continuously available to the employee within reasonable proximity to his residence.
. . . . . .
It was not the aim of the legislative revision, however, to require that an employee be completely helpless before he could recover total and permanent disability compensation."
Also, in Oster, the Supreme Court adopted the "Odd-lot" doctrine which is accepted *36 in virtually every other jurisdiction in the country. To determine if the employee should be classified as an odd-lot worker, the Supreme Court in Oster enunciated the following test, at page 1323:
"In order to determine whether the plaintiff fits within this category of oddlot workers, he must show that because of his physical impairment, mental capacity, education, training, age, availability of employment in his area, and any other relevant factor, that he `cannot perform the substantial and material parts of some gainful work or occupation with reasonable continuity.' Reese v. Preston Marketing Assoc., 274 Minn. 150, 142 N.W.2d 721, 723 (1966). If the plaintiff is successful in showing a combination of factors indicating that the services which he is able to render are so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete, he has presented a prima facie case for classification in the odd-lot category. An offering of such proof by the plaintiff, therefore, satisfies his burden of proving that he should be awarded benefits for permanent and total disability. The defendant employer then has the onus of showing that there are jobs which are available to provide a steady income to the plaintiff or that will provide him with `a gainful occupation.' It is fairer to place the burden on the defendant to show that there are steady jobs available to the plaintiff, after plaintiff has shown his odd-lot status, than to require the plaintiff to prove the universal negative of not being employable at any occupation. Brown v. Safeway Stores [82 N.M. 424], 483 P.2d 305, 308 (N.M.App.1971); Lyons v. Industrial Special Indem. Fund, 98 Idaho 403, 565 P.2d 1360, 1363 (1977); Larson, supra. § 57.61 at pp. XX-XXX-XXX."
Appellee's evidence shows that he was 54 years old at the time of the accident in June, 1979. He has no formal education beyond the ninth grade and his previous employment has been limited to manual labor. For the past 25 years he has worked as a cook. He still suffers from stiffness and limitation of motion in his right arm, in his neck (due to the fusion), and in his lower back. The limitation of motion in his neck and lower back makes driving difficult. Dr. Jackson testified that at least until April 2, 1981, Naquin was unable to continue his employment as cook, and that after this date he could return to work as far as his neck was concerned, but that the constant low back pain that he was experiencing might be disabling. Dr. Jackson refused to extend his diagnosis to appellee's lower back since he was not treating him for this problem. Dr. Landry testified that when Naquin was under his care, he was disabled because of his cervical and lumbar problems. Dr. Herques testified that the vertigo, hearing loss and hypertension, coupled with circulatory problems of which appellee was suffering, should also be taken into consideration in determining his ability to work. A letter dated March 17, 1980, by the Division Supervisor and addressed to Naquin recognizes the disability of appellee due to his vertigo by acknowledging that his attempt to work as a cook could pose a degree of danger.
We conclude that Naquin established that he is at a substantial disadvantage in the competitive labor market. The preponderance of evidence supports the conclusion that he is incapable of performing the type of work he previously performed. The evidence further established that because of the limitation of motion in his arm, neck and back, the constant pain in his lower back, his lack of education, his advanced age, and his lack of training in any occupation other than those which are so limited in quality, dependability or quantity that a reasonable stable market for them does not exist, that he is totally and permanently disabled.
The evidence introduced by appellant fails to rebut a finding that Naquin is permanently totally disabled to engage in a gainful occupation for wages. The "job" offered by appellant is insufficient to rebut this finding. It is a job which appellee could not perform for the same reasons that he could not perform the duties of a cook.
*37 The job offered by appellant was that of a laborer at appellant's warehouse in Houma. The job description given was that appellee's duties would include washing the fleet of company cars, washing windows, etc. This type of work necessarily involves the lifting of heavy buckets of water, bending and stretching. These types of activities are those which are preventing Naquin from performing his duties as cook.
Appellant also offered the testimony of Dr. James T. Williams, who examined Naquin on March 28, 1980 at appellant's request, and who found appellee to have satisfactory range of motion in his lower back and found no evidence of nerve root compression. Regarding the conflicting opinions of the treating physicians and the physician who examined appellee for litigation purposes only, the Supreme Court in Schouest v. J. Ray McDermott & Co., Inc., supra, stated at page 1044:
"... Such diagnosis and the opinions of the treating physician and specialist to whom referred by the treating physician, are entitled to more weight than that of those doctors examining the plaintiff for consultation for litigation purposes."
Furthermore, medical testimony "must be weighed in the light of other credible evidence of a non-medical character, such as a sequence of symptoms or events in order to judicially determine probability." Vicknair v. Southern Farm Bureau Casualty Ins. Co., 292 So.2d 747 (La.App. 4th Cir.1974); writ denied, 296 So.2d 838 (La.1974).
Thus, we find that appellant's evidence is insufficient to rebut Naquin's showing that he can perform no services other than those which are so limited that a reasonably stable market for them does not exist. Accordingly, we hold that appellee is entitled to an award of total and permanent disability benefits.
LSA-R.S. 23:1201.2 provides for the assessment of penalties and attorney's fees against an employer for failure to pay policy benefits within 60 days after receipt of proof of loss and demand for payment, when such failure is found to be arbitrary, capricious, or without probable cause.
Since this statutory provision is penal in nature, it is to be strictly construed and the stipulated sanctions should be imposed only in those instances in which the facts negate probable cause for nonpayment. Crawford v. Al Smith P. & H. Service, Inc., 352 So.2d 669 (La.1977).
Before it can be determined whether or not the employer's action in refusing to pay the claim was arbitrary, capricious, or without probable cause, it must be determined what information it used, or had available to it, to base its course of action.
Although Naquin had informed the company's first aid man, Tillery, of his injury on his next and final hitch, he made no demand for compensation benefits until some ten months later when he sent appellant a written notice of his accident and resulting injury. The fact of this later formal notice must be viewed in light of the remaining facts and circumstances.
There is some conflicting testimony regarding whether or not Naquin's supervisor and other company personnel were made aware of his condition prior to the time of the written notice in March, 1980. Mr. Tillery testified that he related the story of Naquin's accident to Mr. Chaisson, Naquin's supervisor, on the last day of the June 22, 1979 hitch. However, Mr. Chaisson testified that he does not remember such a conversation, but that it could have occurred. Mr. Chaisson stated that his first recollection of knowing of the suitcase accident and resulting injury was in May of 1980.
E.H. Charbula, Assistant Superintendent of employee relations for appellant, met Naquin on June 22, 1979 to discuss company retirement plans. Mr. Charbula testified that during this visit, appellee discussed with him the pain he was having in his shoulder area, but he does not remember Naquin specifically mentioning the origin of his pain.
Based upon the fundamental rule of appellate review, that the trial judge's factual determination will not be disturbed in the absence of manifest error, Crump v. *38 Hartford Acc. & Indem. Co., 367 So.2d 300 (La.1979), this court finds that the trial court was not unreasonable in evaluating the credibility of the witnesses and in making inferences of fact when it found that informal oral notice of the accident had been given by appellee to his superiors within days after the accident.
Regarding the failure of appellant to pay compensation benefits upon demand in March of 1980, we find that the facts known to appellant at the time benefits were refused do not justify the denial. Relying upon a report from a physician whose examination was precipitated only upon appellant's request, which found that Naquin was able to return to work, and making no effort to receive reports from appellee's many treating physicians, does not justify refusal of compensation benefits. It is incumbent upon the employer to make a reasonable effort to ascertain the employee's exact condition at the time which compensation benefits are demanded. In this case, appellant had available the file of its accident and sick benefits insurer, which included numerous medical bills that had been paid reflecting the existence of appellee's neck and back problems. Appellant also failed to conduct an investigation of Naquin's complaint by interviewing his fellow workers who might have been present during the accident or who viewed the results of the accident.
Appellant made no reasonable effort to obtain the information that was available regarding Naquin's accident and injury through its insurer and other employees. Appellant appeared satisfied simply to rely upon the report of a physician who examined appellee on one occasion. Thus, we find that the trial judge did not abuse his discretion in assessing penalties and attorney fees since appellant acted arbitrarily, capriciously, and without probable cause in declining to pay the compensation benefits. The trial court awarded $1500.00 attorney fees, and since the appellee did not answer the appeal requesting an increase, this amount will not be disturbed. Willis v. Ford Motor Co., 383 So.2d 136 (La.App. 3rd Cir.1980); Richard v. Standard Fittings, 379 So.2d 33 (La.App. 3rd Cir.1979).
We accept the decision of the trial court in its finding that only $5,377.70 of the numerous medical bills which were filed into evidence by appellee totalling $7,000.69, could be attributed to the neck and back injury. Appellant claims a credit for payments made to Naquin under their sick and accident benefits plan. With respect to these payments, if credit is to be afforded against workmen's compensation payments, appellant must show that they were paid and received as compensation.[3]
It is well established that sick leave payments are benefits which the employee has already earned by virtue of past services rendered and therefore may not be credited against compensation due. Kaupp v. City of New Orleans, 248 So.2d 99 (La. App. 4th Cir.1971); Guerrera v. City of New Orleans, 212 So.2d 223 (La.App. 4th Cir.1968); Hammond v. Sewerage & Water Board of New Orleans, 204 So.2d 699 (La. App. 4th Cir. 1967); Chase v. Warren Petroleum Corporation, 168 So.2d 861 (La.App. 2nd Cir.1964). Further, in order for an employer to receive a credit against workmen's compensation payments, the employer must show the amounts were paid as compensation and not as an insurance type payment for which the employee has been paying premiums during his employment. Gonzales v. Coastal Wire Warehouse, Inc., 328 So.2d 923 (La.App. 4th Cir.1976). This, appellant did not do. Accordingly, appellant is not entitled to a credit against compensation for payments made under their sick and accident benefits plan.
For the above reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] LSA-R.S. 12:1221(1)(2) states:

"Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
(1) For injury producing temporary total disability of an employee to engage in any gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and wheter or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training and experience, sixty-six and two-thirds per centum of wages during the period of such disability.
(2) For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds per centum of wages during the period of such disability."
[2] LSA-R.S. 12:1221(3) states:

"For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability, but not beyond a maximum of four hundred weeks for such partial disability resulting from injury occurring on and after September 1, 1975, and on or before August 31, 1976; and not beyond a maximum of four hundred twenty-five weeks for such partial disability resulting from injury occurring on and after September 1, 1976, and on or before August 31, 1977, and not beyond a maximum of four hundred fifty weeks for such partial disability resulting from injury occurring on and after September 1, 1977; provided further that for any week during which the employee is paid any compensation under this subdivision (3) the employer shall be entitled to a reduction of one full week of compensation against the maximum number of weeks for which compensation is payable under this subdivision (3) and for any week during which the employee is paid no compensation, because of the employee's actual earnings during that week, the employer shall not be entitled to a reduction for that week against the maximum number of weeks for which compensation is payable under this subdivision (3), and in no event shall the total number of weeks of compensation for such partial disability under this subdivision (3) be increased beyond the maximum number of weeks stated in this subdivision (3).
[3] Chase v. Warren Petroleum Corporation, 168 So.2d 861 (La.App. 2d Cir. 1964); McGee v. State, Through Bd. of Commissioners, 355 So.2d 1079 (La.App. 4th Cir. 1978).